Jerold D. Friedman (SBN: 290434)
    jerry@lawofficejdf.com
LAW OFFICE OF JEROLD D. FRIEDMAN
19744 Beach Blvd. #390
Huntington Beach, CA 92648
Tel: (213) 536-1244
Fax: (281) 667-3506

Attorney for Plaintiffs
ARIANA HUEMER AND
EEYORE'S HEN HARBOR

# U.S. DISTRICT COURT
# NORTHERN DISTRICT of CALIFORNIA
# SAN JOSE DIVISION

| | |
|---|---|
| ARIANA HUEMER and EEYORE'S HEN HARBOR, a California nonprofit corporation,<br><br>         Plaintiff,<br><br>               v.<br><br>SANTA CRUZ COUNTY ANIMAL SHELTER; MELANIE SOBEL, TODD STOSUY, CARLOS MONTES, and Does 1–10, inclusive, each in their individual capacity,<br><br>         Defendants. | Case No. **5:21-cv-7372-SVK**<br><br>**SECOND AMENDED COMPLAINT for:**<br><br>**1. First Amendment**<br>**2. Fourth Amendment**<br>**3. Fourteenth Amendment**<br>**4. *Monell* Liability**<br>**5. Cal Civ. Code § 52.1 (Bane)**<br>**6. Conversion**<br>**7. Trespass to Land**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Ariana Huemer and Eeyore's Hen Harbor (collectively, "Plaintiffs") file this Second Amended Complaint with leave pursuant to the Court's order (see Doc. No. 34). Plaintiffs allege as follows against the Santa Cruz County Animal Shelter, and Melanie Sobel, Todd Stosuy, Carlos Montes, and Does 1–10, inclusive, each in their individual capacity (collectively, "Defendants"):

## I. JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT

1.      This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1367. Federal questions arise pursuant to 42 U.S.C. § 1983 and the United States Constitution. Venue is proper pursuant to 28 U.S.C. § 1391 because the events giving rise to this Complaint happened in the Northern District.

2.      **Intradistrict Assignment,** pursuant to Civil L.R. 3-2 and 3-5, is to the San Jose Division because the injuries described herein, the agency Defendant is an entity serving the County of Santa Cruz and, upon information and belief, Plaintiffs allege that the individual Defendants reside in the County of Santa Cruz.

3.      Plaintiffs timely filed their government claim against the government entity. The claim was denied. Therefore, they have exhausted their administrative remedies.

## II. PARTIES

4.      Plaintiff **Ariana Huemer** ("Ms. Huemer") is a natural person and California resident.

5.      Plaintiff **Eeyore's Hen Harbor** ("Hen Harbor") is a California nonprofit corporation located at 7331 W. Zeyante Rd., in the City of Felton, in the County of Santa Cruz. Hen Harbor was founded by Ms. Huemer who serves as its president, director, and principal employee.

6.      Defendant **Santa Cruz County Animal Shelter** ("County Agency") is, according to its website, "a non-profit Joint Powers Authority (EIN 90-0039494)" organized and existing under the laws of the State of California. Its principal place of business is 1001 Rodriguez St., Santa Cruz 95062. Defendant Melanie Sobel is its general manager. Plaintiffs are informed and believe that County Agency is a division or service of the County of Santa Cruz, which is a political subdivision of the State of California. Therefore, County Agency and its employees, contractors, and other agents acted under color of state law at all material times alleged herein.

7.      Defendant **Melanie Sobel** ("GM Sobel") is sued in her individual capacity. She is the General Manager of the County Agency. In each act committed or omitted as described herein, she acted in the course and scope of her employment and under color of state law. GM Sobel is Defendant Stosuy's direct supervisor. GM Sobel knew of, approved, and directed the actions by County Agency employees as complained about herein. Additionally, GM Sobel develops and helps to develop the several County Agency policies and customs complained about herein.

8.      Defendant **Todd Stosuy** ("Supervisor Stosuy") is sued in his individual capacity and is a supervisor (Field Services Manager) of the County Agency and Officer Montes. In each act committed or omitted as described herein, he acted in the course and scope of his employment and under color of state law. At no time did he take action to stop abusive seizures, despite what he personally observed.

9.      Defendant **Carlos Montes** ("Officer Montes") is sued in his individual capacity and is an officer (Animal Control Officer II) of the County Agency. In each act committed or omitted as described herein, he acted in the course and scope of his employment and under color of state law. At no time did he take action to stop abusive seizures, despite what he personally observed.

10.     The true names of the defendants named herein as **Does 1–10** (collectively, "Does" or "Doe Defendants"), whether individual or otherwise, are unknown to Plaintiffs who therefore sue Doe Defendants by fictitious names. Plaintiffs are informed and believe that Doe Defendants are California residents. Plaintiffs are informed and believe and, on that basis, alleges that each of the Doe Defendants have participated in unlawful acts alleged in this Complaint. Doe Defendants who are County employees, as described in each act committed or omitted herein, are sued in their individual capacity, acted in the course and scope of their employment, and under color of state law. At no time did any of the Does take action to stop violations of law despite what they personally observed. Plaintiff will seek leave to amend this Complaint to show such true names when they have been determined.

11.     At all relevant times herein mentioned, each of the Defendants were acting pursuant to a contract or other agreement among the agents, employees, partners, joint venturers, co-conspirators, successors or predecessors in interest, owners, principals, and employers of the other Defendants, and in doing the things hereinafter alleged, were acting within the course and scope of such agency, partnership, employment, ownership, joint venture and/or conspiracy. Plaintiffs are further informed and believe and based thereon allege that the acts and conduct herein alleged of all such Defendants were known to, authorized by, and/or ratified by the other Defendants, and each of them.

12.     Whenever in this Complaint an act or omission of a government, corporation or business entity is alleged, said allegation shall be deemed to mean and include an allegation that the government, corporation or business entity acted or omitted to act through its authorized officers, directors, agents, servants and/or employees, acting within the course and scope of their duties, that the act or omission

was authorized by managerial officers or directors, and that the act or omission was ratified by the government, corporation or business entity.

13.     This Court has personal jurisdiction over each of the Defendants because each either resides in, is based in, or is authorized or registered to conduct or in fact does conduct, substantial business in, California.

### III.   INTRODUCTION

14.     This is a private attorney general action brought by Plaintiffs on their own behalf and on behalf of the general public. Ms. Huemer is a longstanding, effective advocate against cruelty and mistreatment of nonhuman animals. Her work rescuing and rehabilitating birds and other animals has been repeatedly recognized as exemplary over the last three decades. In 2012, Ms. Huemer founded Hen Harbor. Hen Harbor has successfully rescued, rehabilitated, and provided long-term housing for countless abused and neglected chickens, other birds, and occasionally other animals. Neither Ms. Huemer nor Hen Harbor have ever been charged with mistreating animals.

15.     Since at least 2011, Ms. Huemer has frequently and publicly criticized multiple policies and actions of County Agency and its employees. For example, in recent years, she repeatedly condemned County Agency's policies to kill or ban roosters and she has helped organize local rooster owners to oppose the same policies. During the August 2020 CZU fire that shortly preceded the events of this case, Ms. Huemer warned the public that County Agency was far too likely to allow distressed and abandoned birds to die in cases where they could be saved.

16.     County Agency and its employees developed an animus against Plaintiffs in their misguided response over the years. As Ms. Huemer's criticism continued over the past decade, the County Agency and employee animus escalated. It culminated in September 2020 with the unlawful retaliation now at issue that immediately followed Ms. Huemer's warnings to the public.

17.     The parties have had a long, cooperative history when it came to Defendants' governmental oversight of Hen Harbor. Each time Defendants requested access to Hen Harbor, Ms. Huemer voluntarily granted them access at the time of their request or at a time convenient to the parties. Defendants recognized that they had *never* seen significant problems nor unlawful conduct on those

visits. Yet Defendants concealed Ms. Huemer's past cooperation and long record of *protecting* birds from the Magistrate as their part of the false pretense for the warrants at issue in this case.

18.     Extended retaliatory actions began with unfounded complaints against Plaintiffs regarding "potential hoarding" after Ms. Huemer rescued approximately 100 abandoned chickens due to the CZU fire and the chickens' owners being forced to evacuate themselves. Defendants Stosuy and Montes investigated in such a biased manner to obtain an indictment against any innocent person such as Ms. Huemer. Then, enforcing an unconstitutional County Agency policy or custom, these Defendants orchestrated two retaliatory raids of Hen Harbor *without any pre-deprivation notice or hearing*. Defendants concealed material information from the Magistrate when they sought warrants for the raids, then executed the two grossly over-reaching search warrants that comprehensively, but baselessly, targeted Ms. Huemer and her charitable organization.

19.     Moreover, Defendants solicited complaints against Ms. Huemer that concerned the chaotic period after the CZU fire when Ms. Huemer was doing County Agency's job of saving distressed and abandoned birds. Even the complainants solicited by these Defendants recognized that Ms. Huemer was, in fact, caring for the birds whom she rescued. Hen Harbor is a large operation founded in large part to help animals in medical need. It typically harbors and treats sick and injured birds, which Defendants' veterinarian admitted is not unusual for such organizations. Hen Harbor harboring and treating sick and injured birds is no more evidence of a crime than County Agency harboring and treating sick and injured birds. Defendants misrepresented these material facts to the Magistrate.

20.     In the first raid, Defendants seized approximately 270 healthy birds and approximate a dozen who were ill but evidently well-cared for. (Only one bird had a wound and bandage. The other ill birds, even those placed in quarantine, looked healthy.) Defendants returned in a second raid and seized approximately 80 healthy birds. As developed below, these unannounced raids were traumatic, interfered with therapies, and caused the death or disappearance of many birds. There was no condition at Hen Harbor that justified County Agency from seizing any animal at any time.

21.     During the first raid on September 21, 2020, Defendants found all animals in very good or reasonably good health, bearing in mind that Hen Harbor exists to rescue and rehabilitate animals, some of whom arrive sick and take time to mend. Not only was Ms. Huemer providing proper care and attention, there was abundant evidence that Ms. Huemer regularly sought help from veterinarians.

Indeed, at the first raid, *Defendants seized veterinary medications and more than five hundred pages of veterinary records extensively covering the previous two years, some dating back more than five years*. Defendants seized but ignored this exculpatory evidence.

22.     Despite seeing no abuse, no neglect, or not even one citable offense on the first raid, again following policy and custom, Defendants sought a second warrant with no pre-deprivation hearing. At the *ex parte* hearing on the second warrant, Defendants withheld what they observed personally on the first raid, never alerting the Magistrate that the first raid found abundant evidence of ongoing and active veterinary care with the birds in acceptable condition and no chargeable offense. Nor did Defendants check with Hen Harbor's several veterinarians (named in the seized veterinary records) or volunteers who would have stated unequivocally that Ms. Huemer cares for and improves the lives of Hen Harbor's animals. Defendants then mounted the second raid on October 2, 2020, found no unhealthy birds, but seized approximately 80 nonetheless.

23.     Both raids were massive affairs, with approximately eight County Agency officers and two Sheriff's deputies, encompassing Ms. Huemer's private residence as well as the property and facilities to care for the animals. In all, Defendants seized 371 or more chickens, turkeys, ducks, geese, and two goats. In addition to veterinary medicines and medical records, the County Agency employees seized Plaintiffs' computers and, inexplicably, some of her clothes and other personal effects. At the first raid, one Defendant rammed their County Agency van into a Hen Harbor structure, causing damage.

24.     The birds Hen Harbor cares for are sensitive and panic easily. As many of the birds came from places of trauma, neglect, or abuse, such as those rescued from the CZU hellscape, they experience worse panic around strangers or when chased. Yet under the false pretense of seizing the birds for their own welfare, Defendants chased and trapped the birds, broke quarantine of the sick birds, and stuffed too many into transport crates that caused the birds dangerous levels of stress, exposed healthy birds to disease, worsened the state of the sick and sensitive birds, and caused some to die. Defendants' deliberate indifference to the animals they violently captured – which continued during the birds' captivity at the County Agency – reveals the lie to any claim that these raids were well motivated.

25.     To be clear, Defendants never charged Ms. Huemer with any misconduct concerning animal care or captivity before, during, or after the raids, even until the filing date of the instant complaint. There was never any actionable condition, much less any emergency, to justify either raid.

26.    Ms. Huemer requested two post-seizure hearings, one for each raid. Defendants failed to prove their case at either post-seizure hearing and the judicial officer ordered Defendants to return all animals and property to Ms. Huemer. Ms. Huemer provided abundant testimony, including from veterinarians with actual knowledge of Ms. Huemer and her charity, their regimen of comprehensive care, and their frequently good results restoring birds to good health. One of Hen Harbor's regular veterinarians testified that Ms. Huemer makes timely appointments and routinely follows her advice. Defendants offered no testimony by any veterinarian and no testimony that Ms. Huemer does not care for her birds—none whatsoever.

27.    Despite the judicial officer's order, Defendants did not return all animals to Hen Harbor. Intentionally or with deliberate indifference, Defendants allowed many of Ms. Huemer's animals to "disappear" while Defendants transported them to the County Agency. (How many fell out of vehicles, escaped, or were released is unclear.) Other birds died in Defendants' custody/captivity due to lack of or delayed treatment, stress caused by Defendants, were killed by the County Agency, or were inexplicably and unjustifiably given to third parties who have kept or killed them. Of the 371 or more animals taken into custody by Defendants, only approximately 266 were returned. The others, more than one hundred animals seized by the County Agency, are still unaccounted for despite the judicial officer's order and despite Plaintiffs' repeated demands to return all seized animals.

28.    With respect to Hen Harbor's flock, County Agency was the proverbial wolf in sheep's clothing. Defendants pretended to offer aid but instead caused death and degradation in the chaos they caused and while they pointlessly held healthy and cared-for animals captive. This destruction reflects grievously flawed policies and customs of the County Agency in addition to Defendants' retaliation. County Agency has not even offered an explanation of what happened to the missing animals. To protect the general public in the future and for the harms that she suffered, Plaintiffs bring this case.

### IV.    FACTS

29.    Ms. Huemer has been an animal advocate for over thirty years. In her tenure, she has been a humane investigator for Farm Sanctuary and the Humane Society of the United States for approximately ten years. Each are nationally acclaimed animal welfare organizations. In these roles, Ms. Huemer has been trained how to recognize and report the neglect and abuse of animals including

medical neglect and hoarding conditions. Ms. Huemer has also been employed by veterinarians and, in her present capacity, routinely consults with veterinarians and follows their advice.

30.     Ms. Huemer provides excellent care for the animals at Hen Harbor. The quality of her work is enhanced because she forms deep emotional bonds with the animals in her care of greater magnitude than is typical of humans and nonhumans. She also suffers stress and grief over the injury or death of her animals to a much greater extent than is typical of humans. She regards the animal residents of Hen Harbor as part of her family.

### Description of Hen Harbor

31.     Ms. Huemer founded Hen Harbor in 2012 to rescue and rehabilitate chickens, ducks, and geese who are neglected, abused, and/or unwanted. Ms. Huemer does not turn away as many difficult cases as do many rescues and shelters. Consequently, Hen Harbor frequently receives sick and injured birds. It's typical for Hen Harbor to have more sick or injured animals as compared to other rescues and shelters of Hen Harbor's size. Ms. Huemer is frequently successful at restoring sick and injured birds to good health through her own acumen and working with local veterinarians.

32.     Hen Harbor was also created as a sanctuary: for the health and happiness of every animal whom it receives to rehabilitate or provide a home. For example, on or about August 2020, a lightning storm caused the CZU fire in the County of Santa Cruz that burned 86,500 acres. Over the next several days, Ms. Huemer rescued approximately 100 chickens from the fire-ravaged land. The rescued chickens were each injured by the smoke, fire, or suffered distress due to the fire. Each faced death by dehydration, starvation, or predation. Ms. Huemer brought these animals to Hen Harbor for their safety and rehabilitation until their owners could reclaim them after forced evacuations were lifted.

33.     Additionally, Ms. Huemer uses Hen Harbor to help educate the public on the care and welfare of chickens and other animals including their physical, mental, and emotional needs. She advocates on their behalf in political and other forums.

34.     Hen Harbor was also created in part due to Ms. Huemer's observations over several years that County Agency did not adequately perform its functions as a steward and shelter for many animals.

35.     Hen Harbor's property consists of nearly three acres surrounded by a fence, a typically locked metal gate, her residence, and several barns, coops, sheds, and similar buildings for the animals and their food and other supplies. The facilities are more than sufficient for the birds in her care.

**The County Agency's Animus Against Ms. Huemer**

36.     Ms. Huemer has been a continual vocal critic of the County Agency due to repeated instances when she has disagreed with the County Agency's policies, programs, customs, and actions (collectively referred to hereafter as "policies"). Criticisms of County Agency and its employees that relate to chickens, other so-called farm animals, and Hen Harbor's mission and programs, were made in her official capacity as Hen Harbor's president and director. Her other criticisms, especially those that relate to dogs and other so-called companion animals, were made in her individual capacity. Some instances where Plaintiffs criticized the County Agency to members of the public include:

37.     In 2011 and continually thereafter, Plaintiffs criticized County Agency because its policies will frequently kill high-risk birds rather than work hard to save their lives. Plaintiffs' tireless efforts show many of these birds can be saved.

38.     On or about 2011, Ms. Huemer sent a scathing letter to County Agency after it gave a puppy to someone who had beaten their previous dog to death a week earlier. County Agency promptly retaliated by calling Ms. Huemer's then-employer and attempted (but failed) to get her terminated.

39.     On or about 2013, Ms. Huemer complained to the Santa Cruz Society for Prevention of Cruelty to Animals that the County Agency was allowing people to adopt dogs and cats who had a history of animal abuse. The Society forwarded that complaint to Defendant GM Sobel. But misguided County Agency actions continued, including at least one instance where Ms. Huemer had to bring an attorney to save a healthy cat that the County Agency tried to kill.

40.     Since at least 2016 and through the present day, Ms. Huemer publicly and frequently has criticized the County Agency regarding its explicit and implicit policies to capture and kill roosters from non-rooster-fighting individuals and organizations. Ms. Huemer's public engagement has slowed or canceled the County Agency's implementation of said policies and saved some animals.

41.     Defendants' ongoing animus against Ms. Huemer and Hen Harbor is partly based on her vocally opposing its anti-rooster policy and her rallying opposition. Hence, Defendants were motivated to remove, silence, or intimidate Ms. Huemer so that Defendants could more easily implement said policies. In early 2021, Ms. Huemer was successful in organizing the local community to oppose the County Agency plans to ban certain roosters. Ms. Huemer's actions were a significant reason why the County Agency decided to retract some of the worst parts of its proposal.

42.     During 2016–20, Ms. Huemer would call County Agency on occasion for business reasons. Sometimes the employee who answered would promptly hang up the phone when the employee identified her by name or voice.

43.     During the CZU fire in August 2020, Ms. Huemer repeatedly warned residents in County Agency's jurisdiction not to take their animals to County Agency because County Agency had a policy or propensity to kill healthy animals, especially roosters. Ms. Huemer alerted the public not to lose precious time asking County Agency to rescue their birds by calling the County Agency because its employees were not going into certain areas to rescue animals despite these animals urgently needing rescue. Ms. Huemer stated that she would do what she could to rescue the animals that the County Agency refused to help.

44.     As a result of Ms. Huemer's repeated criticisms, vocal opposition, and successful organizing against County Agency policies and the actions of its employees, Defendants (both institutionally and individually) have an animus against Ms. Huemer. This animus was the moving force behind Defendants' persecution and retaliation against Ms. Huemer.

**Before the raids, Ms. Huemer established an excellent reputation; she never has been charged with wrongdoing, and – despite disagreement – did her best to cooperate with County Agency.**

45.     Ms. Huemer has continually rescued nonhumans, especially birds, over the past thirty years. In the last several years and apart from the Santa Cruz area, Ms. Huemer was a principal rescuer of hundreds of chickens after a tornado destroyed a chicken facility in Georgia, and in California she rescued and rehomed around fifty ducks and geese whose lake dried up and a separate fifty ducks from a failed egg farm in San Diego. Ms. Huemer typically does not get paid for her charitable work.

46.     While at Hen Harbor, Ms. Huemer has taken in and adopted out close to one thousand birds. Hen Harbor receives these and other animals from members of the community. A small percentage are found on the side of the road and taken for care and rehabilitation. Due to County Agency's policies against roosters, Ms. Huemer frequently finds abandoned or wayward roosters. Ms. Huemer takes them as well for their own benefit and to help suppress wild breeding.

47.     Hen Harbor accepts or would accept roosters from County Agency and other government agencies. Hen Harbor has, for example, received roosters from Santa Clara Animal Control, but County Agency rebuffs her offers.

48.     Hen Harbor has always taken County Agency's concerns seriously. For example, on or about 2017, Supervisor Stosuy went to Hen Harbor after he received a complaint that Hen Harbor's chickens were skinny and a goat didn't have enough food. Hen Harbor allowed Supervisor Stosuy to enter the property without a warrant, he investigated, and he found nothing wrong.

**Defendants had no proper basis to raid Hen Harbor or seize its animals.**

49.     In late August 2020, Hen Harbor evacuated its birds with the help of volunteers from the surrounding area due to the threat of the apocalyptic CZU fire. The evacuation moved Hen Harbor's long-term residents and recent rescues to nearby sanctuaries that were safe from the fire. The evacuation was successful despite the chaotic circumstances.

50.     On September 9, 2020, a friend of Supervisor Stosuy sent him an e-mail that acknowledged that the fire was "absolutely terrifying." The friend stated that another person told her that Hen Harbor was "potentially" hoarding chickens. Supervisor Stosuy shared this e-mail with Officer Montes.

51.     Officer Montes promptly solicited unsworn statements purportedly from individuals who helped evacuate or shelter Hen Harbor's animals. The individuals stated that the fire had caused evacuation to be chaotic, some birds had apparent sickness, Ms. Huemer was treating the sick birds, and Ms. Huemer had appeared agitated and distressed to them. None of this should have surprised anyone. Several birds were sick when Ms. Huemer rescued them from the burned landscape. Whether they were sick before the fire or due to the fire conditions is unknown. These statements would not have been sufficient to charge Ms. Huemer with any violation and she was never charged.

52.     The individuals giving statements had not complained to County Agency about Ms. Huemer until Officer Montes solicited their statements. After the fire threat abated, all shelters and individuals who had received birds from Ms. Huemer either returned them to Hen Harbor or adopted them. The individuals who had given statements to Officer Montes had also returned birds to Hen Harbor.

53.     Supervisor Stosuy and Officer Montes surely knew that the devastating fire could cause agitation and distress to Ms. Huemer and her several volunteers, and that being agitated or distressed was not probable cause of any crime. Also, they actually knew that Hen Harbor frequently took in sick and injured birds and they also actually knew that the County Agency had repeatedly inspected Hen Harbor, that Ms. Huemer had been cooperative, and that she was never charged with wrongdoing because they never had any basis to do so.

54.     Supervisor Stosuy and Officer Montes did not gather specific statements from any person that would have justified a charge of wrongdoing, yet almost two weeks after soliciting the complaints—September 21, 2020—Officer Montes sought a warrant to seize Hen Harbor's animals. There was no emergency that justified seizing Hen Harbor's animals when Officer Montes solicited complaints nor was there any emergency two weeks later. Well-trained and unbiased animal control officers would not have sought a warrant. Yet, Officer Montes sought a warrant without a pre-seizure hearing.

55.     Due to Defendants' animus against Plaintiffs, Officer Montes—with the approval of Supervisor Stosuy, his supervisor—failed to inform the authorizing Magistrate of all material facts when alleging Ms. Huemer's crimes of animal abuse and neglect as the basis for a warrant to seize all of Hen Harbor's animals and other property. Indeed, due to Defendants' animus, he concealed material facts that would have shown there was no need for a raid and seizure.

56.     For example, Officer Montes failed to inform the Magistrate that

(a) Ms. Huemer had never been charged with any violation of any kind concerning animals in over forty years of her animal advocacy and work including a decade with Hen Harbor.

(b) On each prior occasion when County Agency officials had sought to inspect her property, she had allowed them to do so.

(c) Defendants had solicited statements concerning Ms. Huemer. The statements had acknowledged the extraordinary circumstances created by the CZU fire.

(d) Any alleged chaos, Ms. Huemer's alleged agitation, and the birds' sickness were easily explained by the devastating fire, during which time Ms. Huemer had stepped up to rescue birds in mortal danger.

(e) Even without a fire, Hen Harbor is a rescue and sanctuary that frequently takes in sick and injured birds and, therefore, the mere presence of sick or injured birds is not evidence of any crime and indeed was to be expected.

(f) The statements he solicited recognized that Ms. Huemer was caring for the sick birds.

(g) Every individual and shelter that had taken custody of Hen Harbor's birds during the fire had in fact returned those birds or adopted them.

(h) He had no more recent information of any alleged concerns over the two weeks between the complaints he solicited and the time he sought the warrant.

(i)  The raid Officer Montes sought would put many of the birds in peril because it would cause them great distress and some of them would likely die as a result.

(j)  There was no emergency so a raid without a pre-seizure hearing was not justified.

57.  Certainly, he never mentioned the animus that Defendants harbored against Ms. Huemer.

58.  Officer Montes added misleading allegations that "narcotics, dangerous drugs, and paraphernalia related to the use and/or sale of such substances such as, hypodermic syringes, hypodermic needles" would be found. Of course they would, as they were required for veterinarian-guided care. The presence of drugs and medical supplies is evidence that Ms. Huemer was in fact treating the birds as was necessary.

59.  As a result, due to Defendants' retaliatory motive, Officer Montes materially misrepresented the corrupt purpose of the warrant, omitted exculpatory facts, and added groundless inflammatory facts so that the Magistrate was unable to make an independent and unbiased decision to sign the warrant.

60.  The property that Defendants sought to seize was extraordinarily broad, going far beyond those animals who could be evidence of a crime, namely, neglected or abused animals. The warrant encompassed the entire Hen Harbor operation, including:

(a)  All animals.

(b)  "Any fowl coop, crate, cage, flight pen, barn, garage, storage units, enclosures, water bowls, food bowls, feeding containers."

(c)  Electronics such as computers and cell phones.

(d)  All medications and medical records.

(e)  Any vehicle in Ms. Huemer's custody or control.

(f)  Other business records.

(g)  Other personal property.

61.  The breadth of the warrant indicates that Defendants were not investigating a crime but instead were attempting to shut down Hen Harbor. Defendants wanted to clean her out by removing her animals, their supplies, their medications and veterinary records (despite being exculpatory evidence), her computers, vehicles and phones, and even her personal effects.

62.     Defendants falsely told the Magistrate that such a massive seizure was appropriate even though they knew there was no legitimate basis to seek a warrant and that they lacked reasonable suspicion of any crime. They concealed from the Magistrate that County Agency lacked the capacity to take on the entire Hen Harbor business, and that the raids would predictably result in Defendants breaking Hen Harbor's quarantines, and killing its birds.

**The First Raid on September 21, 2020**

63.     On September 21, 2020, Supervisor Stosuy, Officer Montes, and several other County Agency employees (collectively, "Employees") entered Hen Harbor property, misusing the warrant that had been obtained under false pretenses.

64.     Upon entry, a large County Agency van that was driven by Doe#1 (a County Agency employee) rammed a wooden post that supported Hen Harbor's car port roof. The collision bent, split, and damaged the post.

65.     The Employees asserted control over the entire property at Hen Harbor, including all of the facilities with animals, Ms. Huemer's residence, and the surrounding land. Ms. Huemer did not prevent any of the County Employees from observing whatever they sought to see or from taking whatever they sought to take that included hundreds of birds and a lot more.

66.     The Employees observed that all animals at Hen Harbor, at least 370, were in good health except for those who were receiving medical care, who were in reasonably good health. All were well fed, a good weight, and had access to predator-proof shelter. The entire three-acre property was not crowded, and it lacked hoarding conditions, unsanitary conditions, or dangerous conditions. Its condition was similar to typical, well-run animal shelters, rescues, and sanctuaries. Only one bird had an apparent condition, an open wound, that suggested medical need, and this bird had a medical bandage covering the wound. It's remarkable that a flock of hundreds of birds contained only one who had an apparent medical need.

67.     All physical evidence in plain view and discoverable (such as by opening drawers) indicated that Hen Harbor, like similar animal rescue organizations, had a population of healthy animals and other animals who were being treated for treatable issues. The house on the property contained hundreds of pages of paper and electronic veterinary records, veterinary medicines consistent with prescriptions, and other medical supplies. A white board was on the property listed several animals

14

with their illnesses and treatment plans. Any reasonable person would conclude these animals were receiving proper care and attention, and Ms. Huemer's appropriate care was even more obvious to any trained animal control officer.

68.     Hundreds of pages of medical records were on-site, dating back to at least 2014, evidenced that Ms. Huemer brought animals who needed medical care to a veterinarian, typically weekly or more frequently. Indeed, Ms. Huemer had an appointment scheduled with one of her regular veterinarians for the next day, September 22. The Employees did not consult Ms. Huemer about the animals' ongoing medical treatment nor scheduled veterinary appointments.

69.     During the seizure, Ms. Huemer told Supervisor Stosuy the medical needs for each seized animal who was undergoing treatment. Her concerns fell on deliberately deaf ears. Neither Supervisor Stosuy nor any other of the Employees recorded any of the animals' needs, not even for the animals with more significant needs, or took any other steps to identify or segregate the birds in need of quarantine. Any reasonably trained animal control officer would have recorded the medical needs of the several sick birds, including being careful to be able to identify and quarantine any of the birds who had communicable diseases.

70.     Ms. Huemer additionally told Supervisor Stosuy that she had rescued 80 or more chickens during the CZU fire that local resident Wes Sperling had left behind, that his birds had various illnesses that Ms. Huemer was treating, and that Wes Sperling had thus far refused to retrieve his birds from Hen Harbor. Ms. Huemer specifically told Supervisor Stosuy not to mix the birds undergoing treatment, who were quarantined, with her healthy birds because of the contagious nature of some illnesses. He ignored her.

71.     Defendants' failure to record the birds' medical needs or to ascertain which birds must be quarantined meant that when the County Agency took custody of many birds, their risk of injury or death significantly increased and indeed many birds became sick and died in the County's custody. The individual Defendants' deliberate indifference to Ms. Huemer's entreaties evidences the corrupt purpose of the warrant and Defendants' agreement to harass, threaten, intimidate, and retaliate against Ms. Huemer for her exercise of her rights to criticize Defendants.

72.     The Employees also entered and searched Ms. Huemer's personal residence at Hen Harbor. In addition to seizing the aforementioned veterinary records, medicine, and supplies, they seized other

personal and private property including three laptop computers, one desktop computer, cameras, cell phones, and a jacket. The jacket had no potential evidentiary value.

73.     Officer Montes claimed that the Employees seized two hundred forty (240) animals. In their pointlessly hyper-aggressive efforts to capture these animals, the Employees chased them and trapped them, causing the animals great distress. The chasing, trapping, and stress predictably could have been avoided if Defendants initiated a pre-seizure hearing.

74.     The Employees did not bring adequate cages, either quantity or quality, to transport the animals to the County Agency. Instead, they commandeered Hen Harbor's cages to make up for the shortage. Contrary to Ms. Huemer's heartfelt pleas to Supervisor Stosuy and others, the Employees seized healthy animals indiscriminately and mixed them with quarantined animals who were contagious and undergoing treatment. These dangerous and deadly behaviors predicably could have been avoided if Defendants initiated a pre-seizure hearing.

75.     Defendants did not seize all the animals at Hen Harbor, leaving behind more than 100. However, because the Employees seized "all" records, medicines, supplies, and computers, they crippled Ms. Huemer's ability to care for the remaining animals particularly if any became sick after the raid. Consequently, Ms. Huemer's ability to conduct Hen Harbor business was severely curtailed. The Employees largely shut Hen Harbor down, which they had planned to do by obtaining a warrant under false pretenses. Ms. Huemer was forced to purchase a new computer to replace those seized so that she could use the Internet and hobble along with Hen Harbor's business needs without her business software and electronic business records that remained on the seized computers.

76.     The Employees poorly secured many of the birds for travel. An unknown number fell off, "escaped," or were released while in transit to the County Agency facility. These "disappeared" animals were not returned and remain missing if not dead. Ms. Huemer identified and took two of her chickens when she saw them walking freely on the road between Hen Harbor and County Agency.

77.     For the birds who made it to the County Agency, Defendants ignored information that Ms. Huemer attempted to give them. Defendants' failure to identify and link each sick bird to their treatment plan made the hundreds of pages of veterinary records useless. What records Defendants kept were poor and manifestly insufficient to provide even basic protections for the birds.

78.     While Ms. Huemer does not judicially admit the truth of the following numbers, what the County Agency claims is revealing.

79.     The County Agency's intake records indicate that two hundred eighty-five (285) of Ms. Huemer's animals arrived on September 21, 2020. Of these, the County Agency's intake staff designated only five (5) as sick, with six (6) more as placed in sick quarters but without any medical notes. Other intake records assert that ten (10) animals were euthanized and seventeen (17) ambiguously either died in transport (dead-on-arrival) or died at the County Agency. Hence, according to its intake staff, thirty-eight (38) animals were sick, dead, or killed. There could have been no surprise that some of the Hen Harbor birds needed health care for that is a central purpose of Hen Harbor. That leaves two hundred forty-seven (247) animals who were healthy at Hen Harbor but still seized by the Employees.

80.     Distinct from intake records, the County Agency's veterinary records indicate that twenty-six (26) animals had medical issues as minor as one chicken who needed her nails trimmed. Veterinary records indicated that six (6) birds were euthanized. The euthanized birds were not seen by a County Agency veterinarian for an average of 4.5 days after arrival, making many of them far worse off than they had been at Hen Harbor where they received daily care. One chicken, for example, was seized on September 21 but her *first* veterinary exam was on October 5 when she was diagnosed as not eating, lethargic, and having a severe disease. Doe #2 euthanized her after their own neglect of not examining her for two weeks that caused or substantially caused her death. She would have had been treated by Ms. Huemer had she not been seized. Does #2–10, each County Agency staff, killed the 6–10 birds listed as "euthanized" in intake and veterinary records without medical urgency and without any pre-deprivation hearing. Does#2–10 had no excuse for killing Hen Harbor's birds. They were healthy or being treated for their medical conditions while at Hen Harbor. Had Does #2–10 contacted Ms. Huemer, she could have reclaimed these birds and treated them. The veterinary records also indicated that nine (9) birds died in transport (dead-on-arrival) or died while at the County Agency.

81.     County Agency's staff veterinarian, Dr. Gleason, admitted that as a rescue and sanctuary organization, Hen Harbor is expected to have "a higher proportion of animals with medical or behavioral needs." Yet, on or about September 21, a County Agency employee posted on its official Facebook page that two hundred forty (240) animals were seized from Hen Harbor. The information

17

was not posted to inform the public of County Agency's legitimate work. It was posted to insinuate and impute onto Ms. Huemer that she neglected and abused her animals despite Defendants knowing that she did not. Defendants knew that based on their own intake and veterinary records, a mere seven-to-nine percent (7–9%) of the population had medical issues *and that Ms. Huemer was treating them.* The County Agency posted this to harass Ms. Huemer, to injure her reputation among the community, and to cripple her ability to engage and organize the community of animal advocates against County Agency's policies. The post generated dozens of condemnations against Ms. Huemer and Hen Harbor, indicating that County Agency's corrupt purpose of the warrant, seizure, and posting was successful.

82.     Shortly after the first raid, County Agency posted on its Facebook page news of the first raid, that it had seized hundreds of animals who were abused and neglected from a large hen rescue in the community. Other Facebook users understood who County Agency insinuated and quickly posted mean and horrible things about Plaintiffs, cheering County Agency and condemning Hen Harbor, despite County Agency's knowledge that Plaintiffs did not abuse or neglect its animals.

**October 2, 2020: The County Agency Again Seized Hen Harbor Animals with a Tainted Warrant**

83.     Ten days after the first seizure, on October 1, 2020, Defendants prepared and Officer Montes obtained a second search warrant that sought the same items as the first, except drug paraphernalia was omitted. The second search warrant was even more baseless than the first as Defendants had witnessed the appropriate and lawful conditions at Hen Harbor from the first raid. Further, Defendants failed to inform the Magistrate of numerous new and important facts of which they had personal knowledge from the first search:

(a) The conditions seen at the first seizure were within the range of reasonable and lawful rescues and sanctuaries.

(b) 91–93% of the animals seized from the first seizure were healthy by County Agency's own assessment.

(c) The sick birds were not examined by a veterinarian for an average of 4.5 days.

(d) An unknown number of animals were lost, "escaped," or were released during Defendants in-transit to County Agency.

(e) Seventeen birds already had died in-transit or while at County Agency, some deliberately killed without giving Ms. Huemer the chance to save them.

18

(f)  Only healthy birds were left at Hen Harbor after the first raid.

(g)  There was no emergency for the first raid or for this planned second raid.

(h)  Hen Harbor had abundant medical records and other medical evidence showing appropriate consultation with veterinarians.

(i)  After the first raid, Ms. Huemer provided County Agency with approximately 545 pages of veterinary records spanning 2019–2020.

(j)  All medications seized were being appropriately administered after consultations with Hen Harbor's regular veterinarians.

(k)  Officer Montes reused the same affidavits used for the first warrant, without checking with veterinarians or anyone else who knew of current conditions at Hen Harbor.

The false message, of course, was that Defendants had seen some meaningful unlawful activity during the first raid, and/or that there was some pressing need to "rescue" birds in distress.

84.    As with the first warrant request, Officer Montes materially misrepresented the corrupt purpose of the warrant, omitted exculpatory facts, and added groundless inflammatory facts so that the warrant was obtained under false pretenses.

85.    Before seeking the second warrant, Defendants never offered Ms. Huemer a pre-deprivation hearing.

86.    On or about October 2, 2020, GM Sobel, Supervisor Stosuy, Officer Montes and other County Agency employees (collectively, "Employees") went to Hen Harbor. Defendant GM Sobel personally supervised or oversaw this second raid. All of Hen Harbor's sick animals were already seized in the first raid because they were easy to seize, being caged in quarantine, leaving only healthy animals at Hen Harbor for the second raid. Despite their good health, Employees seized almost all remaining animals. As before, the Employees chased and trapped the animals before seizing them, causing the animals and Ms. Huemer great distress.

87.    The County Agency's intake records indicate that eighty-six (86) of Ms. Huemer's animals arrived on October 2, 2020. According to the Defendants themselves, every single animal seized during this second raid was healthy.

88.     In total, according to the County Agency's own intake records, more than three hundred seventy (370) animals were seized (chickens, turkeys, ducks, and geese, and two goats). Also according to the County Agency's records, more than 100 animals never came home.

**Post-Seizure Hearings Favored Ms. Huemer**

89.     Ms. Huemer timely requested a post-seizure hearing for each seizure pursuant to statute. The judicial officer found in both hearings that Ms. Huemer is capable and willing to care for the animals.

90.     By the end of second post-seizure hearing, County Agency produced no evidence criminal conduct or birds who were not being reasonably cared for. The judicial officer asked Officer Montes if the County was going to press criminal charges against Ms. Huemer. Officer Montes responded "yes" despite his actual knowledge that he had no evidence then or at any time to justify a seizure of animals, or arrest or conviction of Ms. Huemer.

91.     On October 12, 2020, the judicial officer ordered the County Agency to return all of her animals and other property from the first seizure promptly and he ordered the same on October 19 regarding the second seizure. Defendants slow-walked their response, further endangering the animals.

**County Agency Knew of Its Dangerously Deficient Training and Supervision of Employees**

92.     County Agency has grossly failed to provide constitutionally adequate training and supervision to GM Sobel, Supervisor Stosuy, and Officer Montes. Ms. Huemer and, by extension Hen Harbor, were singled out due to her outspoken criticism of County Agency, its employees, and their policies. Adequate training and supervision of Defendants not to target outspoken citizens, or adequate supervision to prevent such targeting, would have prevented all injuries complained about herein.

93.     Trained and supervised Defendants might have investigated Plaintiffs after Supervisor Stosuy received the initial e-mail. Had they done so, they would have been granted access to Hen Harbor as was routine and no seizure would have taken place as the judicial officer ruled the seizures were not justified. Had Defendants seen any issues that they thought needed to be addressed, but which didn't rise to a criminal level, the parties could have discussed Defendants' recommendations.

94.     Instead, Officer Montes and Supervisor Stosuy exceeded the bounds of well-trained, well-supervised animal control officers. They solicited complaints, sought an emergency warrant when no emergency existed, sought and executed an overbroad warrant, seized animals who were healthy or

were being treated for their illness with ample evidence of veterinary care, drove the County Agency van into the wooden support posts of Hen Harbor's carport, lost several birds and caused several birds to die due to the stress caused or breaking quarantine. Does#2–10 received hundreds of Hen Harbor's birds, couldn't match the birds to any ongoing medical treatment and failed to examine the birds for an average of 4.5 days after intake, and killed several birds without providing Plaintiffs a pre-seizure hearing. County Agency and Officer Montes failed to present any medical evidence or veterinary testimony at either post-seizure hearing which itself suggests Defendants should have returned all animals and other property without defending against Ms. Huemer's demands for replevin.

95.     County Agency's failure to train and supervise its employees is evidently pervasive through the actions and omissions of its several employees who collectively show a pattern of disregard for Ms. Huemer's constitutional and property rights.

**The County Agency Converted One Hundred Hen Harbor Animals**

96.     Whether due to grievously flawed policies, malevolent intent, or both, Defendants did not adequately document the seized animals and rejected Ms. Huemer's help in their identification and description of therapeutic needs. County Agency staff typically identified the seized animals by breed or color that resulted in no reliable means to match the seized birds of similar breeds and colors with their medical records.

97.     Even when Defendants may have accurately identified medical needs, for some birds the County Agency lacked even rudimentary tools for health care. For example, inexplicably, the County Agency does not have a nebulizer. Even though Ms. Huemer had told Supervisor Stosuy and other employees that some birds needed a nebulizer—which she had, was using, and offered to loan Defendants for her animals' health—Defendants did not request it from Ms. Huemer. Therefore, Defendants made it impossible for some of the animals to receive proper medical treatment.

98.     While the County Agency held hundreds of Hen Harbor animals in custody, repeatedly, Supervisor Stosuy and GM Sobel were informed that no employee of the County Agency had discussed any ongoing medical needs of the seized birds with Ms. Huemer. Ms. Huemer also sent them communications listing the medical needs and treatment that several of the birds were receiving while in Hen Harbor's care, demanded the return of all of the sick birds for their treatment to continue, and demanded the return of the hundreds of animals who were healthy because there was plainly no

21

basis for County Agency to keep a person's healthy animals without their consent. No one from the County Agency responded to any of her entreaties. Compounding its deliberate indifference, the County Agency left many animals without proper treatment.

99.     On September 30, 2020 (between the two raids), one of Ms. Huemer's regular veterinarians gave Supervisor Stosuy an additional approximately five hundred forty-five (545) pages of medical records spanning 2019–20, seeking to ensure that Defendants had the birds' full veterinary records for their needed care, and as evidence that the animals had been being given proper care and attention by Ms. Huemer.

100.    On October 9, 2020, these medical records were sent again to Supervisor Stosuy and GM Sobel. Due to their grossly inadequate policies or customs, deliberate indifference, or Defendants apparently did not take this information into account, causing further sickness and death to Ms. Huemer's birds.

101.    Ms. Huemer gave the County Agency repeated demands and opportunities to save the lives of her birds that should never have been seized. Ms. Huemer had individualized knowledge of each bird, but the County Agency refused to consult with her or provide her an opportunity, either informally at the County Agency or formally before a judicial officer, to save her birds. Defendants seized sick birds who were on the mend, caused them stress, broke their quarantine, refused medical and treatment information from their caretaker, and delayed their treatment for an average of 4.5 days before their first veterinary exam until, according to Defendants, they were so sick that they had to be killed.

102.    County Agency also gave some of Hen Harbor's seized birds to people who did not own them. In one particularly egregious example, an unknown County Agency employee gave Kaley, Ms. Huemer's turkey, to Wes Sperling, a third party, without lawful authority. County Agency knew that Wes Sperling raised chickens and turkeys for slaughter. Supervisor Stosuy admitted to Ms. Huemer that the County Agency gave Kaley to Wes Sperling. Ms. Huemer demanded that Defendants return Kaley but Defendants did not seek her return. Instead, County Agency spoke with Wes Sperling and told him not to talk to Ms. Huemer. Subsequently, Wes Sperling killed Kaley himself or sold her at auction and allowed others to kill her. County Agency created a peril, had a duty to rescue Kaley, but failed to do so, and tried to cover it up by telling Wes Sperling not to talk to Ms. Huemer.

103.     Finally, nearly four weeks after the first seizure, and almost as long after the administrative orders, on October 17, 2020, the County Agency returned an initial two hundred fifty-one (251) animals. Thereafter, an estimated fifteen (15) birds were made available for Ms. Huemer to retrieve, which she did. Based on the County Agency's own intake records, one hundred five (105) animals were never returned. According to Hen Harbor's records and estimates of chickens rescued during the CZU fire and aftermath, County Agency failed to return two hundred eleven (211) animals. They remain missing despite the judicial officer's order and Ms. Huemer's repeated demands for the return of every seized animal.

**Ongoing Persecution of Ms. Huemer by the County Agency**

104.     Officer Montes knew that at each post-seizure hearing he produced no evidence for the cost of care for the animals seized and the judicial officer expressly stated at the second hearing that the County Agency forfeited any right to collect such fees. Acting against the judicial officer's orders, Officer Montes sent a letter to Ms. Huemer on October 14, 2020, demanding that she pay all costs related to the seizure totaling eight thousand one hundred sixty dollars ($8,160). Officer Montes stated that if she failed to pay said fee by October 5, 2020 [*sic*], the eighty animals seized in the second search would be deemed abandoned and disposed of, that Ms. Huemer reasonably interpreted to mean County Agency would kill them. Officer Montes's threat was made to bluff her into paying County Agency more than eight thousand dollars, to terrorize her, or both.

105.     Of note, Officer Montes apportioned sixty dollars ($60) of the fees to veterinary costs for the second seizure despite County Agency records showing that none were sick. A mere $60 in veterinary costs indicates that all of the birds in the second seizure were healthy and essentially nothing was done for the birds even if they had been sick. Shockingly, County Agency argued at the hearing for the second seizure hearing that the birds were seized to protect sick animals, even though County Agency employees knew at the time of seizure and after examined by its veterinary staff that none were sick.

106.     On or about October 19, 2020, Supervisor Stosuy knew the judicial officer's Oct. 12 ruling on the first seizure and therefore he knew (a) the County Agency lost the first seizure hearing, (b) the judicial officer determined that none of Ms. Huemer's animals were abused or neglected, and he knew from County Agency's own records that (c) 91–93% of the seized birds were healthy. Supervisor Stosuy also knew or should have known that (d) none of the animals from the second seizure had any

medical issues, and (e) his own Dr. Gleason confirmed some animals at Hen Harbor were expected to have medical issues. Nonetheless, based on zero evidence of any crime, Defendants posted a statement of intent to prosecute Ms. Huemer on County Agency's web site and publicly available quarterly reports. Members of the public who read these misleading statements would reasonably believe Ms. Huemer was charged with felony animal abuse. This was simply was not true. This statement was also published to defame, harass, and intimidate Ms. Huemer to silence her criticisms of County Agency, drive her out of the Santa Cruz County, or put Hen Harbor out of business.

107.    The published "intent to prosecute" Ms. Huemer remains published by County Agency to this day. Some members of the public who read County Agency's published statement about Plaintiffs routinely ask Ms. Huemer to explain while others believe the statement and avoid doing business with Plaintiffs. County Agency has failed to apologize for or retract any implication of Plaintiffs committing a crime. County Agency deleted its false and defamatory Facebook post without any explanation or apology, so thousands of members of the public still believe Plaintiffs are criminals.

108.    Ms. Huemer's computers were not returned until November 12, 2020, one month after the judicial officer ordered the return of all Ms. Huemer's property and after her repeated demands. Here again, the County Agency delayed the return of Ms. Huemer's business computers, not for any legitimate purpose but only as further retaliation.

## V.   CAUSES OF ACTION

109.    All of the above-stated facts are incorporated by reference in each of the following causes of action.

### № 1
### Retaliation — First Amendment / 42 U.S.C. § 1983
### (Plaintiffs and Against All Individual Defendants, including Doe Defendants)

110.    Individual Defendants, including at least GM Sobel, Supervisor Stosuy, and Officer Montes, as well as Doe Defendants, retaliated against Ms. Huemer, and against Hen Harbor, on the basis of her protected speech in violation of the First Amendment, made applicable to the states through the due process clause of the Fourteenth Amendment.

111.    This included retaliation because of Ms. Huemer's criticism of the County Agency at the time of the CZU fire, as well as her extended vocal criticism the County Agency as recently as 2020 and

her efforts to organize the local community against its policies and customs harming roosters and other animals, all of which is protected speech.

112.    Examples of the retaliation are detailed extensively in the Facts, including (without limitation) intentional and deliberately indifferent misconduct such as (a) seizure and lengthy detention of healthy animals and other animals who were receiving proper care and attention, without lawful authority, (b) absent and substandard medical treatment of Ms. Huemer's birds throughout their time in County Agency's possession, (c) failure to return said animals and property both before and even for an excessive amount of time after the judicial officer's orders; (d) giving Kaley to Wes Sperling, failing to retrieve Kaley from Wes Sperling, and giving advice to Wes Sperling to cover up their misconduct; and (e) public announcements to defame and accuse Ms. Huemer of committing crimes despite knowing that she committed no crime.

113.    Defendants' actions were intended to chill and silence Plaintiffs' free speech, cause her severe emotional distress, bankrupt Hen Harbor, and/or force them to leave the County. Such actions would chill a reasonable person's free speech. Said acts and omissions by GM Sobel, Supervisor Stosuy and Officer Montes served no legitimate government goal.

114.    In committing the acts and omissions alleged above, individual Defendants acted in a despicable manner; with malice, fraud, or oppression; with extreme indifference to the rights of Plaintiffs at a level which decent persons should not have to tolerate; and with intent to cause harm to Plaintiffs. Individual Defendants are therefore liable for punitive damages.

### № 2
### Unreasonable Seizure — Fourth Amendment / 42 U.S.C. § 1983
### (Plaintiffs and Against All Individual Defendants, including Doe Defendants)

115.    All Defendants intentionally, unreasonably seized Plaintiffs' animals and other property in violation of the Fourth Amendment, made applicable to the states through the due process clause of the Fourteenth Amendment.

116.    Upon arrival at Hen Harbor, the individual Defendants, including Doe Defendants, knew that very few of Plaintiffs' animals had any health issues and that those with health issues were being treated actively and typically successfully. They knew after seizing the animals that at least 91% from the first seizure and 100% from the second seizure were healthy, and the remaining 7% of the animals

from the first seizure had no actual medical issues, nominal medical issues, and/or were being medically treated and were receiving proper care and attention, including veterinary care.

117.    It is unreasonable to seize any animals with a warrant obtained through false pretenses. It is further unreasonable to seize healthy animals, animals who have nominal medical issues, animals who are receiving proper care and attention, or any animals motivated by a policy to harass Ms. Huemer. It is unreasonable to search and seize any other property related to the seizure of Ms. Huemer's animals when the seizure of the animals was unreasonable. The second seizure of animals was even worse, because Defendants had actual knowledge of the quality of Ms. Huemer's care (which they concealed from the Magistrate).

118.    In committing the acts and omissions alleged above, individual Defendants acted in a despicable manner; with malice, fraud, or oppression; with extreme indifference to the rights of Ms. Huemer at a level which decent persons should not have to tolerate; and with intent to cause harm to Ms. Huemer. Individual Defendants are therefore liable for punitive damages.

**№ 3**
**Deprivation of Property without Procedural Due Process —**
**Fourteenth Amendment / 42 U.S.C. § 1983**
**(Plaintiffs and Against All Individual Defendants, including Doe Defendants)**

119.    In violation of the Fourteenth Amendment's guarantees of Procedural Due Process, GM Sobel, Supervisor Stosuy, Officer Montes, and Does#1–10 deprived Plaintiffs of property by their dispossessing Plaintiffs of hundreds of birds without any pre-deprivation hearing. The unconstitutional raids caused the death, disappearance, and damage to great numbers of Plaintiffs' birds.

120.    California Penal Code § 597.1 was the statutory basis for Defendants' seizure of Plaintiffs' animals. It provides, in relevant parts,

> "Every owner, driver, or keeper of any animal who permits the animal to be in any building, enclosure, … of any city, county, city and county, or judicial district without proper care and attention is guilty of a misdemeanor. Any … animal control officer [who] has reasonable grounds to believe that very prompt action is required to protect the health or safety of the animal or the health or safety of others, the officer shall immediately seize the animal and comply with subdivision (f). In all other cases, the officer shall comply with the provisions of subdivision (g). …."
> P.C. § 597.1(a)(1).

121.    This statutory procedure applies only to those animals that "Every owner of any animal who permits the animal to be in any building…," *id*., and not for Plaintiffs' 370 or more animals after the moment that they were seized by Defendants and kept in their actual or constructive custody.

122.    Doe Defendants, who are believed to be County Agency's veterinary staff, intentionally killed 6–10 birds (the discrepancy is based on inconsistent intake and veterinary records) and killed others due to being deliberately indifferent to their health such as by mixing healthy birds with sick birds and causing extreme stress to all of the birds. The other 200 or more birds escaped from, were abandoned by, were lost by, or were given to third parties by the other individual Defendants. Each Defendant set into motion or participated in a material way for the death or disappearance of the estimated 211 animals who were not returned to Plaintiffs.

123.    There is no procedural regimen for Defendants to provide notice and opportunity for Plaintiffs to reacquire their sick birds in their custody before Defendants killed them intentionally or through their deliberate indifference. Plaintiffs called and e-mailed County Agency, namely GM Sobel and Supervisor Stosuy, begging for the return of her healthy and sick animals so that she could continue their medical treatment, but County Agency failed to respond. Defendants did not respond due, in part, to there not being a procedure that applies to these facts. County Agency lacks procedural safeguards to protect the animals of its customers, including Plaintiffs, before its veterinary and other staff kill, abandon, lose, or give them away to third parties.

124.    The government has no interest in killing birds who were actually healthy, whose nonmorbid condition became morbid due to the actions or omissions of its employees, and whose morbid condition were being treated and could be reversed by others such as Ms. Huemer or her veterinarians.

125.    In committing the acts and omissions alleged above, individual Defendants acted in a despicable manner; with malice, fraud, or oppression; with extreme indifference to the rights of Ms. Huemer at a level which decent persons should not have to tolerate; and with intent to cause harm to Ms. Huemer. Individual Defendants are therefore liable for punitive damages.

**№ 4**
***Monell* Liability / 42 U.S.C. § 1983**
**(Plaintiffs Against County Agency)**

126.    County Agency operates as a governmental entity either independently or under a joint power authority granted to it by the County of Santa Cruz and other municipalities. County Agency is therefore a person subject to 42 U.S.C. § 1983 liability pursuant to *Monell v. Dept. of Soc. Servs. of the City of N.Y. et al.,* 436 U.S. 658 (1978). Its policymakers include the board of directors and its general manager, GM Sobel.

127.    Predictably, exercise of the County Agency's police powers will result in seizure of live animals that are the property of private persons, including the determination of what animals (healthy or otherwise) are to be seized, the need to care for animals while in custody, and the return of animals to their owners. Accordingly, pursuant to the 14th Amendment, the County Agency must have policies concerning:

(a) When it offers pre-deprivation hearings.

(b) When its officials have authority to seize animals.

(c) How to protect animals in its custody, including sufficiently prompt delivery of health care, sufficient tools to provide health care, sufficient provisions to separate healthy and sick animals, consideration of information provided by owners of the animals, and how to ensure animals who are beyond its ability (such as by lack of equipment) receive care.

(d) Protection against giving animals to persons that are not owners of the animals as well as protection against animals disappearing while in its custody.

(e) Procedures to ensure the prompt return of animals to their owners.

128.    Considering each of the above-specified policies needed to protect live animals such as those at issue in this case, County Agency's policy makers – acting intentionally or with deliberate indifference (a) failed to adopt a required policy, (b) adopted a policy that was not constitutionally sufficient, (c) adopted a constitutionally sufficient policy that it disregarded as a matter of custom as known to its policy maker, and (d) its policymaker made a decision in this case to disregard constitutional requirements with no lawful basis. In addition or in the alternative, considering each of the above-specified policies needed to protect live animals such as those at issue in this case, (e)

28

County Agency failed to train, supervise, and discipline its employees so that they knew when and how to implement the required policies.

129.    As described throughout the instant Complaint, Plaintiffs have federal and state constitutional rights to free expression without retaliation, rights to be secure with their personal and real property without unreasonable invasion or seizure, and rights not to be deprived of their property without procedural protections.

130.    County Agency failed to train and supervise its employees to ensure that private persons who are vocal and critical of itself and its employees are treated lawfully and equally as every other private person should be treated, and to discipline every employee who acts intentionally or with deliberate indifference to such person's constitutional rights. If County Agency had established adequate policies to protect the constitutional rights of Plaintiffs and similarly situated members of the public, its employees would have been trained not to violate Plaintiffs' rights or, if training didn't take, County Agency would have a policy to discipline such employee to prevent repeated violations.

131.    County Agency enacted, adopted, decided, or ratified several policies, procedures, practices, customs, or the equivalent, that caused or were the moving force behind Plaintiffs' injuries, or County Agency's failure to enact effective policies, procedures, practices, customs, or the equivalent that the lack of such policies, procedures, practices, customs, or the equivalent was itself a policy.

132.    The policies or lack of polices that caused Plaintiffs' injuries include but are not limited to allowing its employees to do, failing to train them not to do, failing to supervise them to ensure that they do not do, or failing to discipline after they do the following:

    (a) To use animus to bias employees' judgment and actions.

    (b) To retaliate against any person for any reason.

    (c) To seek warrants when there is no immediate need.

    (d) To mislead a Magistrate by withholding material information.

    (e) To seize animals who are on a person's private property and are healthy, reasonably healthy, undergoing veterinary care, or receiving proper care and attention.

    (f) To consider ample veterinary records, medicines, and other supplies as inculpatory rather than exculpatory evidence that animals are undergoing veterinary care.

    (g) To capture animals with distressful or unsafe methods.

29

(h) To transport animals with unsafe and insecure methods.

(i) To seize animals whose condition is likely to worsen if seized.

(j) To seize purportedly sick animals or animals likely to be distressed without having a veterinarian present.

(k) To mix healthy animals with quarantined animals at any time.

(l) To mismatch animals with veterinary records.

(m) Not to minimize the stress of animals at every stage of a seizure to prevent their emotional distress and premature deaths.

(n) Not to examine purportedly sick animals promptly upon intake.

(o) Not to give continuity of veterinary care for the entire time animals are in custody.

(p) To give animals to anyone other than who has the legal right to receive them.

(q) Not to recover animals wrongfully given to third parties.

(r) To keep a private person's animals and other property when there is no legal cause to keep them.

(s) To delay returning animals and other property when ordered to return them by a court or other court-like proceeding.

(t) To prepare and execute large-scale animal seizures and: (i) commandeering crates and cages from private persons, (ii) losing or allowing seized animals to escape, (iii) disregarding veterinary information, (iv) failing to match animals with their veterinary information, (v) failing to treat sick animals an average of 4.5 days after seizure, (vi) mismatching animals that results in inconsistent intake and veterinary records, (vii) allowing seized animals to be lost in County Agency's system, and (viii) not to have an immediate plan to return animals and property when the situation requires their return.

(u) To publish false, misleading, or defamatory information about private persons and to allow such information to remain published without express retraction or apology to ward off foreseeable ongoing injuries to their reputation.

(v) To harass or terrorize private persons even after the private person prevails in court or other court-like proceeding.

133.     One or more of the foregoing constitutional violations caused Plaintiffs to suffer each of their injuries as alleged throughout the instant Complaint.

134.     County Agency and its policymakers have longstanding, persistent, and widespread practice of these customs that evidence either an affirmative policy or imply a *de facto* policy. Whether affirmative or *de facto*, County Agency and its policymakers have knowledge and approval of these policies as evidenced, in part, by GM Sobel and Supervisor Stosuy being present at the second raid when only healthy animals were observed and seized, and when Plaintiffs begged GM Sobel and Supervisor Stosuy for the return of their healthy animals as well as their sick animals for continuity of veterinary care. Actual knowledge is also evidenced by Supervisor Stosuy being involved in every step of the investigation, warrant, and seizure, and the judicial officers orders to County Agency.

135.     Moreover, having been made aware of the constitutional violations of its employees, County Agency policymakers ratified their constitutional conduct and failed to take prompt steps to minimize the harm suffered by Ms. Huemer. County Agency and its policymakers increased their esteem and standing in the community by reporting the raid on Hen Harbor, and their esteem and standing remain artificially high because County Agency has failed to retract or apologize for its wrongful actions against Ms. Huemer and Hen Harbor.

136.     Each of these constitutional violations caused – in addition to the harms of the raids *per se*, the death, damage, and disappearance of hundreds of Ms. Huemer's birds. In addition to property damage, Ms. Huemer suffered psychological with physical manifestations, detailed below.

137.     Given this manifestation of the animus against Ms. Huemer, declaratory and/or injunctive relief is appropriate to ensure the County Agency adopts and implements constitutionally required policies.

138.     Policymakers include (without limitation) GM Sobel, Supervisor Stosuy, County Agency's board of directors, as well as others who may be identified as having policy-making authority, and who enacted, adopted, followed, and/or ratified said challenged County Agency policies. These policy makers subverted their public service and constitutional mandates with the injurious policies, practices, procedures, or customs complained about herein.

139.     County Agency adopted and implemented unconstitutional polices, or failed to adopt and implement constitutional policies, that were intentionally or deliberately indifferent to Plaintiffs' rights

as well as the rights of persons similarly situated. Had County Agency adopted and implemented such policies (implementation requiring adequate training, supervision, and discipline), Plaintiffs would not have been injured, therefore County Agency's policies or lack of policies was the moving force of each of Plaintiffs' injuries.

№ 5
**Bane Act — Cal. Civ. Code § 52.1**
**(Plaintiffs and Against All Defendants, Including Doe Defendants)**

140.    The Bane Act forbids interference by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the U.S. Constitution, its laws, or the rights secured by the California Constitution or its laws.

141.    All Defendants, including Doe Defendants, targeted Ms. Huemer on account of her speech that is protected by the federal and California constitutions, specifically her speech that criticized and opposed County Agency's actions and policies, and on account of identifying or perceiving her as a member of a class of individuals such as an animal rescuer, animal advocate, animal rights activist, member of HSUS, protestor, community organizer, or whistleblower.

142.    Defendants attempted and specifically intended to interfere with Ms. Huemer's rights to free speech, to petition the government, to own property, to equal protection, and to due process, under the federal and California constitutions. Defendants attempted to and achieved these goals to varying extents through threats, intimidation, and coercion including but not limited to seizing her animals and substantial additional property, intentionally interfering with or shutting down Hen Harbor, and publicly defaming her. Defendants' actions and omissions injured Ms. Huemer. The Defendants' conduct was a substantial factor in causing said harm.

143.    In committing the acts and omissions alleged above, individual Defendants acted in a despicable manner; with malice, fraud, or oppression; with extreme indifference to the rights of Ms. Huemer at a level which decent persons should not have to tolerate; and with intent to cause harm to Ms. Huemer. Individual Defendants are therefore liable for punitive damages.

1
2

**№ 6**
**Conversion/Intentional Misconduct Depriving Plaintiffs of Property**
**(By All Plaintiffs and Against All Defendants, Including Doe Defendants)**

3
4
5
6

144.     Plaintiffs owned and had the right to possess numerous birds who, after being seized by Defendants, were destroyed, died, were given away, were damaged, or disappeared while in Defendants' possession. Defendants, including Doe Defendants seized a minimum of one hundred fifteen (115) birds who were returned dead or were never returned.

7
8
9
10
11
12
13
14
15
16
17
18
19

145.     Defendants intentionally, substantially harmed Ms. Huemer's property. Even if it were lawful to have seized so much of her property (which is denied), and even if it were lawful to have withhold her property after demands for its return (which is denied), without intending to recap all of the allegations above, Defendants' intentional and/or with deliberate indifference includes (without limitation) their refusal even to accept or consider information about medical needs and needs for quarantine when offered by Ms. Huemer and her veterinarian, too long delayed even basic evaluation of birds, and failed to have essential medical equipment available (or even to ask Ms. Huemer for such equipment) all of which contributed to cause death and damage to the birds. Additional intentional misconduct included at least giving Kaley the turkey to a third party, refusal to reclaim Kaley and other missing birds, and failures to keep track of birds so that they "disappeared." Plaintiffs did not consent to her birds being seized and were harmed as a result of them dying, being killed, given to others, or disappeared. Defendants' actions and inactions were a substantial factor in Ms. Huemer's injuries.

20
21
22
23

146.     Having never even charged Ms. Huemer with any violation, Defendants had no discretion to fail promptly to return any of seized property, which should have been done even before the judicial officer's order to return all of Ms. Huemer's birds. If Defendants had acted as required by law, Plaintiffs would not have been deprived of the many birds that died or disappeared as a direct result of the raids

24
25
26
27

147.     In committing the acts and omissions alleged above, individual Defendants acted in a despicable manner; with malice, fraud, or oppression; with extreme indifference to the rights of Ms. Huemer at a level which decent persons should not have to tolerate; and with intent to cause harm to Ms. Huemer. Individual Defendants are therefore liable for punitive damages.

28

## № 7
### Trespass to Land
### (Plaintiffs Against Doe#1)

148.    Ms. Huemer and Hen Harbor have the right to possess Hen Harbor property and the structures affixed to the property. Doe#1 intentionally entered the property. Doe#1 exceeded the scope of lawful authority to enter the property when Doe#1 rammed a County Agency van into a wooden car port post affixed to the land and damaged the post. Doe#1 had no discretion to damage any property.

149.    In committing the acts and omissions alleged above, Defendant acted in a despicable manner; with malice, fraud, or oppression; with extreme indifference to the rights of Ms. Huemer at a level which decent persons should not have to tolerate; and with intent to cause harm to Ms. Huemer. Defendant is therefore liable for punitive damages.

## VI.   DAMAGES

150.    In addition to death, disappearance, and other harms to a significant number of animals, as a result of Defendants' unlawful actions and omissions, Ms. Huemer additionally suffered pain and suffering, anxiety, depression, PTSD, panic attacks, insomnia, and generally emotional distress and mental anguish. Ms. Huemer bonds with animals to a greater degree than average people and each animal carries unique sentimental value for Ms. Huemer far in excess of their market value.

151.    Plaintiffs additionally suffered loss of possession and use of their personal property and injuries to their rights to possess and use their real and personal property.

152.    Defendants' actions forced Ms. Huemer to hire an attorney to represent her at the two post-seizure hearings that Defendants knew would be the result of their actions, and then to bring this action.

## VII.   REQUEST FOR RELIEF

Plaintiffs request judgment against Defendants as follows:

1.  Declaratory relief that the seizure of Plaintiffs' animals and other property was without probable cause.
2.  For general and special damages in an amount to be proved at trial.
3.  For sentimental damages for the injury, death, and loss of each animal.

4. For statutory damages as provided by Civil Code § 52, including treble actual damages in an amount to be proved at trial.

5. For consequential and incidental costs and damages.

6. For a civil penalty of $25,000 per violation as provided by Civil Code § 52.

7. For punitive damages against individual Defendants in an amount to be proved at trial.

8. For reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

9. For reasonable attorneys' fees and costs pursuant to Code of Civil Procedure § 1021.5.

10. For reasonable attorneys' fees and costs pursuant to Civil Code §§ 52(b)(3) and 52.1(h).

11. For pre- and post-judgment interest.

12. For such other and further relief as the Court deems just and proper.

## VIII.   JURY DEMAND

153.    Pursuant to Civil L.R. 3-6, Plaintiffs demand a trial by jury.

Dated: July 9, 2022                              By: LAW OFFICE OF JEROLD D. FRIEDMAN
                                                      */s/ Jerold D. Friedman*
                                                      Jerold D. Friedman
                                                      Attorney for Plaintiff